### In re EDGEWATER MOTEL, INC., Debtor.

#### Bankruptcy No. 3–86–00599.

United States Bankruptcy Court, E.D. Tennessee.

Jan. 15, 1988.

Bernstein, Susano & Stair, Doris C. Allen, Knoxville, Tenn., for debtor.

Walker & Walker, P.C., John A. Walker, Jr., Knoxville, Tenn., Wildman, Harrold, Allen, Dixon & McDonnell, Jennie D. Latta, Memphis, Tenn., for Union Planters National Bank.

C. Dan Scott, Sevierville, Tenn., for First Nat. Bank of Gatlinburg.

Frantz, McConnell & Seymour, Robert M. Bailey, Knoxville, Tenn., for Travelers Indem. Co.

Hunton & Williams, Jeffrey S. Norwood, Knoxville, Tenn., for Blaine–Hays Const. Co.

Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, David E. Fielder, Knoxville, Tenn., for Borg–Warner Acceptance Corp.

Egerton, McAfee, Armistead & Davis, P.C., Stephen A. McSween, Knoxville, Tenn., for Bell Atlantic–Tricon Leasing Corp.

Ogle, Wade & Wynn, Donna J. Orr, Sevierville, Tenn., for Sevier County Utilities.

Peck, Shaffer & Williams, William Luther Cooper, III, Knoxville, Tenn., for the City of Gatlinburg and City of Gatlinburg Water Dept.

## MEMORANDUM

RICHARD STAIR, Jr., Bankruptcy Judge.

The debtor seeks confirmation of its "Amended Plan Of Reorganization" (Plan) filed August 6, 1987. Union Planters National Bank (Union Planters), holder of the first mortgage indebtedness encumbering the debtor's real property in Gatlinburg, Tennessee, filed "Objections To Confirmation" on September 25, 1987. A hearing on confirmation was held October 1, 1987.[1]

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(L) (West Supp.1987).

### I

The debtor, Edgewater Motel, Inc., a corporation, owns and operates a motel in the resort town of Gatlinburg, Tennessee. Subsequent to the 1983 tourist season, the debtor demolished its 39–unit motel and commenced construction of its present facility—a 209–room mid-rise resort hotel[2] known as the Edgewater Motel. Union Planters loaned the debtor the construction money for this project; Security Federal Savings and Loan Association, Nashville, Tennessee, was to provide permanent financing and "take out" Union Planters at the conclusion of construction.

In connection with its construction loan, the debtor executed a promissory note in favor of Union Planters on March 1, 1984, in the original principal amount of $7,605,-000 bearing interest at the rate of one and one-half percent (1½%) above the Union Planters prime rate.[3] This note, secured by a mortgage encumbering the debtor's real estate, matured on September 30, 1985. Construction of the Edgewater Motel was substantially complete on April 30, 1985; however, conditions essential to the funding of the permanent financing were not met and the commitment of the permanent lender expired. No permanent financing was obtained by the debtor prior to the filing of its voluntary petition under Chapter 11 on March 24, 1986. Union Planters' fully matured claim as of October 1, 1987, approximated $8,400,000.[4] It is undisputed that Union Planters is fully secured.[5]

In its Plan the debtor designates ten classes of claims and interests. Union Planters is the sole creditor comprising Class II. Class I, consisting of administrative expense claims, represents the only unimpaired class under the Plan. All impaired classes, excepting the Class II creditor, Union Planters, have accepted the

---

1. In addition to the evidence introduced at the confirmation hearing, the court has also considered portions of the debtor's amended disclosure statement filed August 6, 1987, approved as containing adequate information on September 4, 1987.

2. The terms "hotel" and "motel" are used interchangeably by the debtor in its amended disclosure statement and Plan and also by witnesses testifying at the hearing on confirmation. The court draws no distinction between the use of these two terms.

3. Under the permanent financing arrangement contemplated by the debtor, Union Planters, and Security Federal Savings and Loan Association, the permanent loan was to bear interest at a minimum rate of fourteen and one-half percent (14½%).

4. In its pre-hearing memorandum Union Planters reflects a principal and interest balance on October 1, 1987, amounting to $8,329,857.30. The debtor estimates an additional liability for attorney fees approximating $75,000. The parties agree that $8,400,000 represents the amount of Union Planters claim.

5. This court in a Memorandum filed October 29, 1986, after consideration of a motion filed by Union Planters seeking relief from the automatic stay and abandonment, determined the fair market value of the Edgewater Motel, including land and improvements, to be not less than $11,500,000. At the October 1, 1987, confirmation hearing, Jack Mann, an MAI appraiser, testified that the fair market value of the debtor's property is $11,000,000.

Plan.[6] The claim of Union Planters is dealt with under the Plan as follows:

*Treatment of Class II Creditors.* The only creditor under Class II of the Plan is Union Planters National Bank. The Debtor proposes to amortize the debt due to Union Planters National Bank on a twenty five (25) year amortization schedule at nine (9%) percent interest with a ten (10) year balloon payment for all principal remaining due and owing at the end of said period of time. As indicated above, the first payment shall be due on October 1, 1987 and the balloon payment would be due on September 30, 1997.

During the first year of the Plan the Debtor shall pay Union Planters only One Hundred Eighty Thousand ($180,-000.00) Dollars of the amount that would be due to Union Planters under the provisions of Paragraph 1 of this Subsection. Debtor will defer the remaining portion of the first year's payments to be paid in the eighth year of the Plan in equal monthly installments. Interest will be paid on the deferred portion of first year's payments at nine (9%) percent per annum. Interest on this deferred portion will accumulate for the first Plan year and will be paid in equal monthly installments during the second year of the Plan. Interest for the second year and interest thereafter until the deferred portion of payments due for the first year of the Plan are paid in full will be paid on a monthly basis at nine (9%) percent per annum.

During the second year of the Plan Union Planters will be paid only Six Hundred Thousand ($600,000.00) Dollars of the amount that would otherwise be due under Paragraph 1 of this Subsection. The deferred portion of the second year's payments shall be paid in the eighth year of the Plan. Interest on the deferred payment for the second year of the Plan shall be paid in equal monthly installments during the second year of the Plan. Interest on the deferred portion of the second year's payments under the Plan for the third year and successive years until paid in full shall be paid in equal monthly installments at the rate of nine (9%) percent per annum.

During the third year of the Plan Union Planters will be paid only Seven Hundred Thousand ($700,000.00) Dollars of the amount that would otherwise be due under Paragraph 1 of this subsection. The deferred portion of the third year's payments will be paid in the eighth Plan year. Interest on the deferred payment for the third year of the Plan shall be paid in equal monthly installments during the third year of the Plan. Interest on the deferred portion of the third year's payments for the fourth year and successive years shall be paid in equal monthly installments at the rate of nine (9%) percent per annum.

Beginning with the fourth year of the Plan and thereafter until the balloon payment is due, the Debtor shall pay payments in accordance with the amortization schedule set forth in Paragraph 1 above.

Union Planters National Bank shall retain its security interest and all security which it presently holds for payment of its claim. Union Planters National Bank is impaired under the terms of the Plan.

It is undisputed that the claim of Union Planters is impaired within the meaning of § 1124 of the Bankruptcy Code.

Union Planters grounds its objections to confirmation on the following allegations: (1) the Plan does not meet the best interest of creditors test required by § 1129(a)(7); (2) the Plan does not offer a reasonable prospect of success and therefore does not meet the feasibility standard required by § 1129(a)(11); and (3) the Plan discriminates unfairly against Union Planters and does not meet the "fair and equitable" test required by § 1129(b)(2)(A).

**II**

The debtor's Plan can be confirmed only if the court determines that the debtor has complied with all the requirements of

---

**6.** Pursuant to the provisions of 11 U.S.C.A. § 1126(f) (West Supp.1987), the holders of un-impaired Class I claims are conclusively presumed to have accepted the Plan.

Bankruptcy Code § 1129. The salient provisions of § 1129 which are at issue as a result of the Union Planters' objections are as follows:

§ 1129. Confirmation of plan.

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . .

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

. . . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

. . . .

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

. . . .

11 U.S.C.A. § 1129 (West 1979 & Supp. 1987).

## III

### BEST INTEREST OF CREDITORS TEST: § 1129(a)(7)

Under the provisions of § 1129(a)(7)(A)(ii), the court, if it is to confirm the Plan, must find that Union Planters, the holder of a secured claim which has not accepted the Plan, "will receive or retain under the plan on account of such claim ... property of a value, as of the effective date of the plan, that is not less than the amount that [Union Planters] would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."

The House Report describes § 1129(a)(7) as follows:

Paragraph (7) incorporates the former "best interest of creditors" test found in

chapter 11, but spells out precisely what is intended. With respect to each class, the holders of the claims or interests of that class must receive or retain under the plan on account of those claims or interest property of a value, as of the effective date of the plan, that is not less than the amount that they would so receive or retain if the debtor were liquidated under chapter 7 on the effective date of the plan.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

In summary, the court must compare what Union Planters would receive upon liquidation to what it will receive under the Plan. Absent a determination that the Plan provides for Union Planters to receive as much as or more than it would receive upon liquidation under Chapter 7, the confirmation requirements of § 1129(a)(7) will not be met and the Plan cannot be confirmed.

Upon liquidation of the debtor under the provisions of Chapter 7 of title 11, Union Planters would receive in cash the value of its fully secured claim, $8,400,000.[7]

The effect of the debtor's treatment of Union Planters under the Plan is to totally restructure the Union Planters loan. The debtor's obligation to Union Planters matured on September 30, 1985; the Plan provides that Union Planters will be paid on a twenty-five year amortization schedule at nine percent (9%) interest, with a balloon payment in the tenth year consisting of the remaining unpaid balance. However, the Plan further provides that actual payments to Union Planters during the first three years of the Plan will be substantially less than those required by the debtor's proposed twenty-five year amortization schedule: $180,000 will be paid in the first year; $600,000 will be paid in the second year; and $700,000 will be paid in the third year. The payment deficiencies in the first three years are deferred to the eighth year of the Plan and interest at nine percent (9%) on these deficiencies is to be paid monthly beginning in the second year of the Plan. The debtor's Plan payments to Union Planters, actual and deferred, are summarized as follows: [8]

### Payments Due Union Planters Under Plan

| First Year— October 1, 1987 – September 30, 1988 | | |
|---|---|---|
| Due in Year 1 | $ 845,909.88 | |
| Paid in Year 1 | 180,000.00 | |
| Deferred to Year 8 | 665,909.88 | |
| Total Paid | | $ 180,000.00 |
| Second Year—October 1, 1988 – September 30, 1989 | | |
| Due in Year 2 | $ 845,909.88 | |
| Paid in Year 2 | 600,000.00 | |
| Deferred to Year 8 | 245,909.88 | |
| Interest Paid On | 104,799.03 | |
| Deferred Payments—(two years interest on Year 1 deferral one year on Year 2 deferral) | | |
| Total Payment | | 704,799.03 |

7. Jack Mann, the MAI appraiser testifying on behalf of the debtor, testified that liquidation value "severely restricted to, say, two weeks or a month ... will run between 60 and 75 percent of market value." As has been noted, Mr. Mann testified that the market value of the Edgewater Motel is $11,000,000. The issue of liquidation value was not further explored by the debtor's attorney on direct examination and was only briefly alluded to by the attorney for Union Planters on cross examination. The debtor, in its amended disclosure statement and at the hearing on confirmation, has consistently represented that Union Planters is fully secured. The court cannot and will not now conclude from the undeveloped testimony of Mr. Mann that the liquidation value of the debtor's real estate is less than $8,400,000.

8. This analysis has been prepared from an exhibit to the testimony of Stuart Rispler, controller of The LeConte Company, entitled "Projected Payments Under Amended Plan as Modified." The LeConte Company has managed the Edgewater Motel since mid–1986.

Third Year— October 1, 1989 –
September 30, 1990

| | | |
|---|---|---|
| Due in Year 3 | $ 845,909.88 | |
| Paid in Year 3 | 700,000.00 | |
| Deferred to Year 8 | 145,909.88 | |
| Interest Paid On Deferred Payments | 89,176.60 | |
| Total Payment | | 789,176.60 |

Fourth Year—October 1, 1990 –
September 30, 1991

| | | |
|---|---|---|
| Due and paid | $ 845,909.88 | |
| Interest Paid On Deferred Payments[9] | 95,195.67 | |
| Total Payment | | 941,105.55 |

Fifth Year— October 1, 1991 –
September 30, 1992

| | | |
|---|---|---|
| Due and paid | $ 845,909.88 | |
| Interest Paid On Deferred Payments | 95,195.67 | |
| Total Payment | | 941,105.55 |

Sixth Year— October 1, 1992 –
September 30, 1993

| | | |
|---|---|---|
| Due and paid | $ 845,909.88 | |
| Interest Paid On Deferred Payments | 95,195.67 | |
| Total Payment | | 941,105.55 |

Seventh Year— October 1, 1993 –
September 30, 1994

| | | |
|---|---|---|
| Due and paid | $ 845,909.88 | |
| Interest Due On Deferred Payments | 95,195.67 | |
| Total Payment | | 941,105.55 |

Eighth Year—October 1, 1994 –
September 30, 1995

| | | |
|---|---|---|
| Due and paid | $ 845,909.88 | |
| Deferred Payments Years 1, 2, and 3 | 1,057,729.64 | |
| Interest Paid On Deferred Payments | 52,270.60 | |
| Total Payment | | 1,955,910.12 |

Ninth Year— October 1, 1995 –
September 30, 1996

| | | |
|---|---|---|
| Due and paid | | 845,909.88 |

Tenth Year— October 1, 1996 –
September 30, 1997

| | | |
|---|---|---|
| Due and paid | $ 845,909.88 | |
| Balloon payment due September 30, 1997 | 6,950,096.16 | |
| Total Payment | | 7,796,006.04 |

---

The dispositive issue for resolution by the court in determining whether the Plan meets the best interest of creditors test as to the Class II claim of Union Planters is

9. Payments deferred during Plan years one through three total $1,057,729.64. These deferred payments remain unpaid through Plan year seven. Interest on these deferred payments is reflected in this chart for Plan years four through eight; the total amount of deferred payments is not reflected except in Plan year eight, the year of payment.

the present value of the stream of payments provided Union Planters under the Plan. Most of the cases concerning present value arise in the context of "cram down" under the provisions of § 1129(b)(2)(A)(i) or under § 1325(a)(5)(B). Nonetheless, the principle is the same under § 1129(a)(7).

The court has determined that within the context of this Chapter 11 case present value assumes a current market rate of interest on Union Planters' claim based on comparative loans as distinguished from a rate of interest, as argued by the debtor, established pursuant to 28 U.S.C.A. § 1961(a) (West Supp.1987), or in reliance upon the Federal Reserve Bulletin for September, 1987, containing the weighted average during the week of May 4–8, 1987, for long-term loans with a fixed rate where the loan was for $1,000,000 or more. As has recently been noted by Judge Morton, Senior District Judge for the United States District Court for the Middle District of Tennessee:

> Sections 1129(a)(7)(A)(ii) and 1129(b)(2)(A)(i) require the Bankruptcy Court to analyze the present value of the stream of payments or other consideration provided by a plan. This concept of present value assumes the use of *market* rates of interest (as distinguished from the rate specified in the contract) for loans of similar duration, with similar security, and with similar risks. 5 *Collier on Bankruptcy* (15th ed. 1985) ¶ 1129.03[i]; *see, Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982) (construing 11 U.S.C. § 1325(a)(5)(B), the language of which is virtually identical to that contained in § 1129).
>
> In determining the allowed amount of the claim of a fully-secured creditor, the creditor is entitled to his contract rate of interest up to the effective date of the plan by virtue of 11 U.S.C. § 506(b), .... But this rule has no application to the

present value analysis required by § 1129, or to the interest payable on claims after the effective date of a plan. 3 *Collier on Bankruptcy* (15th ed. 1985) ¶ 506.05 at 506–43.

*Federal Land Bank of Louisville v. Gene Dunavant and Son Dairy (In re Gene Dunavant and Son Dairy)*, 75 B.R. 328, 335–36 (U.S.D.C.M.D.Tenn.1987) (emphasis in original).

The debtor's Plan contemplates the payment of interest on any deferred amounts at nine percent (9%). In support of its contention that nine percent (9%) represents a current market rate of interest, the debtor elicited testimony from Michael L. Harmon, a certified public accountant and president of a concern known as TexLaMiss Corp. (TexLaMiss). Mr. Harmon testified that TexLaMiss purchased the River Terrace Hotel in Gatlinburg, Tennessee, on July 8, 1987; that the purchase price was $8,850,000; that $20,000 was paid down; and that the sum of $8,830,000 was financed for a period of five (5) years at nine and four-tenths percent (9.4%) interest with the interest rate to be renegotiated at the end of the five year period.

Mr. Harmon further testified as to the involvement of TexLaMiss in negotiating several projects throughout the South with interest rates ranging from four percent (4%) fixed for five years to eleven percent (11%). Of the various loans discussed by Mr. Harmon, it is apparent that the only loan bearing any similarity to the debtor's proposed treatment of Union Planters' claim under the Plan is that loan involving the River Terrace Hotel. The basic similarity between the River Terrace loan and the debtor's proposed treatment of Union Planters' claim under its Plan are the amounts of the two obligations and their identical geographic locations. However, the debtor's own proof, through Mr. Harmon, establishes a current market rate of nine and four-tenths percent (9.4%), four-tenths percent (.4%) higher than the nine percent (9%) envisioned under the Plan.[10]

---

10. The court further notes that the nine and four-tenths percent (9.4%) interest rate testified to by Mr. Harmon is not truly indicative of the

current market rate of interest. Mr. Harmon testified that TexLaMiss purchased the River Terrace Hotel from First Federal Savings and

Mr. James G. Howell, a partner in the certified public accounting firm of Pannell, Kerr and Forster, testified that the prevailing market rate on October 1, 1987, for a twenty-five year loan with a ten year call providing a payout similar to that set forth in the debtor's Plan for the Union Planters' claim, approximated twelve percent (12%). Richard K. Howarth, a senior consultant with Pannell, Kerr and Forster, testified that the present value of the payments proposed to be made to Union Planters under the Plan, based upon the debtor's nine percent (9%) interest factor, assuming a market rate of twelve percent (12%) for similar loans, approximates $7,000,000.

This court doubts the availability under any current market setting of a loan envisioning the deferred repayment plan such as is provided Union Planters under the debtor's Plan. Nonetheless, considering the criteria espoused by Judge Morton in *In re Gene Dunavant and Son Dairy, supra,* the court, having considered the use of a market rate of interest for "loans of similar duration, with similar security, and with similar risks" concludes that the market rate of interest testified to by Mr. Howell, i.e., twelve percent (12%), represents a current market rate of interest for comparable loans.

As is noted in a leading treatise on bankruptcy:

It is submitted that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the "market" interest rate.

Loan Association which had acquired the hotel through foreclosure proceedings. As acknowledged by Mr. Harmon, the River Terrace Hotel was financed by a seller with an apparent need to divest itself of property due to regulations requiring it to charge that property off against its earnings. The court also notes that Mr. Harmon is the vice-president for finance for The LeConte Company, the entity presently managing the Edgewater Motel.

5 *Collier On Bankruptcy,* ¶ 1129.03, at 1129–62, 63 (15th ed. 1987) (footnote omitted).

As the debtor's Plan contemplates interest at nine percent (9%), the Plan's discount rate is nine percent (9%). The Plan cannot be confirmed because it does not meet the best interest of creditors test required under § 1129(a)(7)(A)(i).

IV

FEASIBILITY REQUIREMENT:
§ 1129(a)(11)

■ As a confirmation requirement, § 1129(a)(11) mandates a determination by the court that "the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor...." The court will not expend a considerable amount of time analyzing the debtor's projections in support of its claim of feasibility. The lack of feasibility appears to be self-evident by the deferred payment method provided in the Plan for payment of the Class II Union Planters claim, the Class III claim of Borg–Warner Leasing, and the Class IV claims of Blaine–Hays Construction Company and First National Bank of Gatlinburg.[11]

The debtor proposes a ten year Plan at the conclusion of which it will sell the Edgewater Motel or refinance the first mortgage claim of its largest creditor, Union Planters. At the end of the ten year Plan period the principal balance of Union Planters' claim will have been reduced by $1,449,903.84, from $8,400,000 to $6,950,096.16. During this ten year period the debtor will defer $1,057,729.64 in payments due in Plan years one through three to Plan year eight.

11. In addition to the $1,057,729.64 due Union Planters during Plan years one through three, payment of which is deferred to Plan year eight, the debtor defers payment of the Borg-Warner Leasing Class III claim totalling $372,240.72 to Plan year six, and payment of Blaine–Hays Construction Company and First National Bank of Gatlinburg's Class IV claims totalling $410,000 and $375,000, respectively, to Plan year seven.

"[T]he longer a debtor intends to take in retiring plan obligations, the more difficult it may be to prove feasibility." *In re White,* 36 B.R. 199, 204 (Bankr.D.Kan. 1983). The ability of the debtor to retire the claim of its major secured creditor is at best speculative. While the debtor projects a sufficient income to meet the payments proposed to various classes of creditors, the court, in view of the substantial amount of payments deferred by the debtor to Plan years six through eight, is not satisfied as to the ability of the debtor to meet these projections. The court cannot make a finding that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor...." 11 U.S.C.A. § 1129(a)(11) (West 1979).

The debtor's Plan does not meet the confirmation requirements of § 1129(a)(11).

### V
### CRAM DOWN: § 1129(b)(2)(A)

■ The court also finds that the Plan violates the "fair and equitable" standard of § 1129(b)(2)(A)(i). The § 1129(b) "cram down" provisions are available to a debtor only "if all of the applicable requirements of subsection (a) of ... [§ 1129] other than paragraph (8) are met with respect to a plan,...." Under such circumstances, § 1129(b) further provides that if all the confirmation requirements of § 1129(a) are met except that of § 1129(a)(8) "the court ... shall confirm the plan notwithstanding the requirements of ... [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

Although the court's finding that the debtor's Plan does not meet the confirmation requirements of § 1129(a)(7) and (11) precludes the debtor from proceeding to "cram down," the court will nonetheless consider the debtor's Plan within the confines of § 1129(b)(2)(A).

For the debtor's Plan to be "fair and equitable" under the provisions of § 1129(b)(2)(A)(i), the Plan, with respect to the impaired non-accepting Class II claim of Union Planters, must provide (1) that

Union Planters retain the lien securing its claim; and (2) that Union Planters receive on account of its claim "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of ... [Union Planters] interest in the estate's interest in [the Edgewater Motel]...."

As has been discussed within the context of the best interest of creditors test under § 1129(a)(7)(A), the inquiry to be made by the court is that of present value:

> If the proponent of a plan attempts to cram down a class of secured claims by means of making deferred cash payments under section 1129(b)(2)(A)(i), the court is required to value the future cash stream so as to establish the present value of the deferred payments provided for under the plan.

5 *Collier On Bankruptcy,* ¶ 1129.03[f], at 1129–60 (15th ed. 1987). Thus, if the Plan proposes to pay interest on the fully secured claim of Union Planters at a rate less than the current market rate, the Plan does not satisfy the "fair and equitable" requirement of § 1129(b)(2)(A)(i). *In re Sullivan,* 26 B.R. 677 (Bankr.W.D.N.Y.1982) (debtor's nine and one-half percent (9½%) interest rate on mortgage balance did not satisfy the "fair and equitable" requirement in a market where the prime rate of interest was in excess of sixteen percent (16%)).

As is further noted in 5 *Collier On Bankruptcy,* ¶ 1129.03, at 1129–62 (15th ed. 1987):

> The concept of "present value" is of paramount importance to an understanding of section 1129(b). Simply stated, "present value" is a term of art for an almost self-evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence. Part of the "present value" concept may be expressed by a corollary proposition: a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence plus (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate.

While the debtor's Plan provides that Union Planters will retain the lien securing

its claim, the Plan, as has been noted in the court's discussion of the § 1129(a)(7)(A) confirmation requirement, does not meet the "fair and equitable" test of § 1129(b)(2)(A)(i). The current market rate of interest on October 1, 1987, the date of the hearing on confirmation, approximated twelve percent (12%); the debtor's Plan proposes to pay Union Planters interest at a rate of nine percent (9%). Further, the Plan does not provide for Union Planters to receive the "indubitable equivalent" of its claim under § 1129(b)(2)(A)(iii). "[T]reatment which is less favorable than the treatment specified in section 1129(b)(2)(A)(i) and (ii) would not satisfy the ["indubitable equivalent"] test." 5 *Collier On Bankruptcy*, ¶ 1129.03[c], at 1129–56 (15th ed. 1987).

The court further notes that § 1129(b)(2), in defining the requirements utilized by the court to determine whether the Plan is "fair and equitable," uses the word "includes." Bankruptcy Code § 102(3) entitled "Rules of construction" provides that "includes" is not limiting. 11 U.S.C.A. § 102(3) (West 1979). The implication in reference to the "fair and equitable" doctrine of § 1129(b)(2) is that the use of the term "includes" is open-ended. The court accordingly finds, irrespective of the statutory definition of "fair and equitable," that

the debtor's Plan, in its treatment of the claim of Union Planters, is not "fair and equitable."

Union Planters' claim matured on September 30, 1985. The debtor's Plan converts the Union Planters construction loan to a twelve year loan (two years since the September 30, 1985, maturity of its loan plus ten years under the Plan) with Union Planters to occupy substantially the same position at the end of the ten year life of the Plan as it occupies today. The debtor presently owes Union Planters $8,400,000; at the end of the ten year Plan period it will owe Union Planters $6,950,096.16 against resort property subject to the use and abuse of the public, which at that time will be almost thirteen years old. In the interim, the debtor will defer until the eighth year of the Plan payment of more than forty-one percent (41%) of those payments due Union Planters during the first three Plan years. In fact, the Plan requirements for liquidating the Union Planters Class II claim, while a panacea for the debtor, causes Union Planters' claim to increase from $8,400,000 on October 1, 1987, to $9,149,393.30 at the end of Plan year three, with a modest reduction to $8,585,401.98 at the end of Plan year seven.[12] Only at the end of Plan year eight, after

12. Under the twenty-five year amortization schedule proposed by the debtor, Union Planters will be entitled to receive $845,909.88, inclusive of principal and interest, during each Plan year for a total of $2,537,729.64 during Plan years one through three. However, the Plan provides that $1,057,729.64 of the first three years payments will be deferred for payment in Plan year eight. This will affect the amount of the Union Planters' claim as follows:

| End of Plan Year | Amortized Balance | Deferred Payment | Total Claim |
| --- | --- | --- | --- |
| 1 | $8,306,287.03 | $698,372.70 (includes deferred payment of $665,909.88 and interest on deferred payment of $32,462.82) | $9,004,659.73 |
| 2 | 8,203,783.13 | 911,819.76 | 9,115,602.89 |
| 3 | 8,091,663.66 | 1,057,729.64 | 9,149,393.30 |
| 4 | 7,969,026.63 | 1,057,729.64 | 9,026,756.27 |
| 5 | 7,834,885.37 | 1,057,729.64 | 8,892,615.01 |
| 6 | 7,688,160.75 | 1,057,729.64 | 8,745,890.39 |
| 7 | 7,527,672.34 | 1,057,729.64 | 8,585,401.98 |
| 8 | 7,352,129.03 | 1,057,729.64 | 8,409,858.67 |
| 9 | 7,160,118.54 | -0- | 7,160,118.54 |
| 10 | 6,950,096.16 | -0- | 6,950,096.16 |

satisfaction of those payments deferred from Plan years one through three, will the Union Planters prepetition claim of $8,400,-000 reflect a reduction.

The debtor's Plan does not meet the "fair and equitable" test with respect to the claim of Union Planters and thus cannot be confirmed under the "cram down" provisions of § 1129(b).

For the reasons set forth herein, confirmation of the debtor's "Amended Plan Of Reorganization" filed August 6, 1987, will be denied.

This Memorandum constitutes findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052.